## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Alexander P. Afonso, being sworn, state:

### Introduction and Agent Background

1. I am a special agent with the Drug Enforcement Administration ("DEA"). I started working for DEA as a special agent after graduating from the DEA Academy in Quantico, Virginia in December 2020. At the DEA Academy, I received extensive training in conducting narcotics investigations, including surveillance, undercover, and enforcement operations; management of confidential sources and operations that use confidential sources; and education in the methods employed by drug traffickers and drug trafficking organizations. After I graduated from the DEA Academy, DEA assigned me to its New England Field Division. Since March 2021, I have been assigned to the New England Field Division's Cross Border Initiative ("CBI") Task Force.

2. Before my employment with DEA, I worked as a special agent for the Diplomatic Security Service ("DSS") for approximately three years and then as an investigator with the Massachusetts Attorney General's Office's Medicaid Fraud Division for approximately one year. I also graduated from the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Brunswick, Georgia and from the DSS's Basic Special Agent Course in Summit Point, West Virginia, where I received additional training in conducting criminal investigations and law enforcement operations. I hold a Bachelor of Science degree from George Washington University in Washington, District of Columbia.

3. As a DEA special agent, I am authorized to investigate violations of the laws of the United States, including violations of federal drug laws (for example, 21 U.S.C. § 841) and money laundering offenses (for example, 18. U.S.C. § 1956). My current duties and responsibilities include the investigation of federal crimes, including violations of the statutes referenced above.

My experience in drug investigations includes physical and electronic surveillance; the execution of search warrants; the effecting of arrests; and the debriefing of defendants, informants, and witnesses who had personal knowledge regarding major narcotics-trafficking organizations.

4. Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers. I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

5. Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

**Purposes of Affidavit**

6. I make this affidavit in support of a criminal complaint against Franklin ARGUETA, a/k/a "FRIZZ" ("ARGUETA") and Luis ARIAS, a/k/a "NACHO" ("ARIAS"),

2

charging ARGUETA and ARIAS with Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 (the "Target Offense").

## Probable Cause

7. In August 2025, the DEA began an investigation of Franklin ARGUETA, a/k/a "FRIZZ" ("ARGUETA") and Luis ARIAS, a/k/a "NACHO" ("ARIAS"). A cooperating source (the "CS") told DEA investigators that individuals s/he knew as FRIZZ (later identified as ARGUETA) and NACHO (later identified as ARIAS) manufactured and distributed counterfeit Adderall and oxycodone pills in the greater Boston area.

8. The CS is cooperating with law enforcement in the hope of receiving consideration/leniency with respect to potential federal drug charges. The CS has a criminal history that includes convictions in state court for controlled substance offenses and for possession of a firearm/ammunition without an FID card. The CS also has prior charges that were later dismissed, including receiving stolen property, assault and battery, resisting arrest, and controlled substance offenses. Information provided by the CS in another investigation resulted in the seizures of narcotics and bulk U.S. currency and in arrests for state drug offenses. Investigators have repeatedly corroborated information provided by the CS. I believe that information provided by the CS is reliable.

9. The CS said ARGUETA and ARIAS used a pill press machine(s) to manufacture the pills they distributed. I know based on my training and experience that, in recent years, drug traffickers have used pill press machines to manufacture counterfeit Adderall pills (typically containing methamphetamine) and counterfeit oxycodone pills (typically containing fentanyl).

10. During the investigation, investigators used information provided by the CS to identify "FRIZZ" as ARGUETA and determined that ARGUETA resided at 86 Butterfield Street,

Lowell, Massachusetts. Among other things, a person matching ARGUETA's driver's license photograph referred to himself as "FRIZZ" in recorded communications with an undercover officer. ARGUETA is listed on the deed to 86 Butterfield Street and, between August 2025 and February 2026, investigators saw him there.

11.     Similarly, investigators used information provided by the CS to identify "NACHO" as ARIAS and determined that ARIAS resided at Unit 311 of The Guild Somerville, an apartment building located at 154 Broadway, Somerville, Massachusetts. Among other things, a person matching ARIAS's driver's license photograph referred to himself as "NACHO" in recorded communications with an undercover officer. Employees at The Guild Somerville confirmed that ARIAS resided in Unit 311, a relative of ARIAS's is listed on the lease, and, between August 2025 and February 2026, investigators saw ARIAS accessing The Guild Somerville.

*August 2025 – October 2025: ARGUETA and ARIAS Sold Approximately 5,000 Counterfeit Adderall Pills Containing Methamphetamine to the CS*

12.     Between August 2025 and October 2025, investigators directed the CS to perform controlled purchases of counterfeit Adderall pills from ARGUETA and ARIAS.[1] The CS performed three controlled purchases of counterfeit Adderall pills—for 1,000 pills, 1,000 pills, and 3,000 pills—from ARGUETA and ARIAS during this period. The purchases occurred in Suffolk and Middlesex counties. The CS arranged the deals with ARIAS and ARGUETA and had recorded communications with ARIAS on the encrypted messaging application Signal, including video calls that showed ARIAS's face. ARGUETA personally delivered the pills to the CS on one occasion. On that occasion, ARGUETA entered the CS's car to deliver the pills and ARGUETA's face was shown on a covert, preserved video feed inside the car. ARGUETA and

---

[1] I am intentionally withholding certain details about the controlled purchases described in this section in order to protect the CS's identity and physical safety.

ARIAS both personally delivered the pills to the CS on another occasion. Prior to the latter purchase, investigators saw ARIAS leaving The Guild Somerville with a paper bag that investigators believe contained the pills that ARGUETA and ARIAS later sold to the CS.

13. Before the first two controlled buys, investigators met with the CS. During those meetings, investigators searched the CS for drugs or other contraband without finding any. Investigators equipped the CS with a covert audio/visual recording device. If any cash was to be provided, investigators provided the CS with official government money to make the buy. Investigators followed or accompanied the CS to the buys. The third controlled buy occurred sooner than expected; investigators were unable to observe the same protocols.

14. After each of the buys, investigators immediately met with the CS and seized from her/him the contraband s/he got from ARGUETA and ARIAS. Investigators then searched the CS again for any other contraband and found none.

*15.* The pills that ARGUETA and ARIAS sold to the CS between August 2025 and October 2025 were tested at a DEA laboratory and found, through sampling, to be 4,944 pills containing methamphetamine (4.6% - 4.9% pure) and weighing 1,379.4 grams.

*October 2025: ARGUETA Received Payment for Pills from an Undercover Officer at a Location in Middlesex County*

16. In October 2025, investigators directed the CS to introduce an undercover officer, posing as a drug trafficker ("UC-1"), to ARGUETA and ARIAS. The CS did so. In October 2025, ARGUETA met UC-1 at a location in Middlesex County and received $1,500 official money from UC-1 as payment for pills ARGUETA sold to the CS.[2] ARGUETA introduced himself to UC-1

---

[2] I am intentionally withholding details about this payment to protect the CS's and UC-1's identities and physical safety.

as "FRIZZ."

*January 14, 2026: ARGUETA Took 10,000 Suspected Counterfeit Pills Containing Methamphetamine Out of 86 Butterfield Street, Lowell, and Sold Them to UC-1 at a Location in Middlesex County*

17. In January 2026, ARGUETA agreed in recorded communications on Signal to sell approximately 10,000 counterfeit pills to UC-1. ARGUETA's face appeared in a recorded video call discussing the transaction. ARGUETA agreed to meet UC-1 at a location in Middlesex County on a date in January 2026.[3]

18. On the date of the buy, at approximately 9:20 a.m., investigators saw a gray Honda that ARGUETA drives outside 86 Butterfield Street, Lowell.

19. At about 11:42 a.m., UC-1 drove to the meet location. At about 12:12 p.m., investigators saw ARGUETA and another male exit 86 Butterfield Street, Lowell. ARGUETA was carrying a backpack and black plastic bag in his hand, both of which he put in the trunk of the gray Honda. ARGUETA got into the driver's seat and the unidentified male got in the passenger's seat. Investigators followed the gray Honda directly to the meet location. Once there, ARGUETA got out and retrieved the black plastic bag. ARGUETA proceeded to the meeting; the other male stayed in the car.

20. At about 12:45 p.m., investigators saw ARGUETA arrive at the meet location with the black plastic bag. Once there, UC-1 took possession of the black plastic bag. ARGUETA returned to his car, drove away, and was followed to a bank where he went inside.

21. Investigators met with UC-1 at a neutral location. The bag that ARGUETA gave UC-1 contained a white plastic bag with approximately 10,000 orange pills inside (two Ziplock

---

[3] I am intentionally withholding details about this controlled purchase to protect the CS's and UC-1's identities and physical safety.

bags with approximately 5,000 pills each).[4]  The pills were marked "AD/30" and were consistent in appearance with pills previously bought from ARGUETA and ARIAS.  The pills were sent to a laboratory for testing.  Based on my training, experience, and familiarity with this investigation, including the fact that pills previously bought from ARGUETA and ARIAS were found to contain methamphetamine; and the size, shape, cost, and appearance of the pills; and the fact that counterfeit pills containing methamphetamine are commonly colored orange and stamped "AD/30," I believe the pills will be found to contain methamphetamine.

22.     I further believe, based on an average weight of 0.279 grams per pill on pills that ARGUETA and ARIAS previously sold to the CS, that the approximately 10,000 pills will be found to weigh approximately 2,790 grams.

*February 10, 2026: Investigators Executed Search Warrants at ARGUETA's and ARIAS's Residences and Seized Methamphetamine, Counterfeit Pills, and Firearms*

23.     On February 9, 2026, the Hon. Jennifer C. Boal, U.S. Magistrate Judge, signed warrants authorizing law enforcement to search ARGUETA's residence (86 Butterfield Street, Lowell) and ARIAS's residence (Unit 311, The Guild Somerville).  On the morning of February 10, 2026, investigators executed the warrants.  At ARIAS's residence, investigators found what appeared to be tens of thousands of counterfeit Adderall pills and a firearm.  At ARGUETA's residence, investigators found Home Depot buckets containing approximately thirty pounds of a crystalline substance.  Investigators performed a field test of the substance; the test was positive for methamphetamine.  Investigators also found tens of thousands of what appeared to be

---

[4] On this occasion, and on a prior occasion, ARGUETA sold a firearm and ammunition to UC-1.  In the future, investigators may seek to charge ARGUETA for Possession of Firearms and Ammunition in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c).

counterfeit Adderall pills and two firearms at ARGUETA's residence.  A photograph depicting the items found at the two locations is below.



24.     The pills seized from ARGUETA's and ARIAS's residences were marked "AD/30" and were consistent in size and appearance with pills previously bought from ARGUETA and ARIAS.  The pills were sent to a laboratory for testing.  Based on my training, experience, and familiarity with this investigation, including the fact that pills previously bought from ARGUETA and ARIAS were found to contain methamphetamine; the fact that crystal methamphetamine was seized from ARGUETA's residence on February 10, 2026; the size, shape, and appearance of the pills; and the fact that counterfeit pills containing methamphetamine are commonly colored orange and stamped "AD/30," I believe the pills will be found to contain methamphetamine.

8

25. According to Commonwealth of Massachusetts records, neither ARGUETA nor ARIAS possess a valid firearms identification ("FID") card.

26. In conclusion, I submit that probable cause exists to believe ARGUETA and ARIAS committed the Target Offense, i.e., Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846.

*Alexander Afonso* DLC
Alexander P. Afonso
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me via telephone in accordance with Fed. R. Crim. P. 4.1 on this ~~11th~~ 12 day of February 2026.

_____
HONORABLE DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE